THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HENRY CARTER HILLENBRAND, Defendant-Appellant.

Third District   No. 3—85—0573

Opinion filed August 22, 1986.—Rehearing denied October 2, 1986.

1076

Thomas A. Lilien, of State Appellate Defender's Office, of Ottawa, for appellant.

Gary L. Peterlin, State's Attorney, of Ottawa (Gerry R. Arnold, and Walter Hehner, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE STOUDER delivered the opinion of the court:

On October 19, 1970, the defendant, Henry Hillenbrand, was convicted on two counts of the offense of murder based on his negotiated plea of guilty. Under the terms of the plea bargain the State agreed not to seek the death penalty. Prior to sentencing the defendant escaped from the La Salle County jail. On May 2, 1983, the defendant was recaptured in Missouri and subsequently returned to custody in La Salle County. Thereafter he filed a motion to withdraw his guilty plea alleging his attorney rendered ineffective assistance of counsel by failing to investigate sufficiently the possibility of a voluntary-intoxication defense and by failing to advise the defendant of that potential defense. The motion was denied and the trial court sentenced the defendant to imprisonment for a term of 80 to 240 years on one count to be served consecutively to a sentence of 50 to 150 years on the other count. A notice of appeal was filed but, without the defendant's having filed the required motion to withdraw his guilty plea after sentencing, the cause was remanded to the trial court. On remand a motion to withdraw the guilty plea and to vacate the judgment of conviction was filed. From the denial, defendant appeals.

■ The basic statement of policy governing withdrawal of guilty pleas is that if the plea is entered on a misapprehension "of the facts or of the law" or in consequence of misrepresentation by the State's

Attorney "or someone else in authority," where there is doubt of the guilt of the accused, or where justice would be "better served by submitting the case to a jury," the court should permit the withdrawal of a plea of guilty. (*People v. Nichols* (1981), 96 Ill. App. 3d 354, 420 N.E.2d 1166.) The decision, however, rests within the sound discretion of the trial court, to be granted not as a right but rather as necessary to correct manifest injustice; the defendant bears the burden of proof. *People v. Nichols* (1981), 96 Ill. App. 3d 354, 420 N.E.2d 1166.

▮ The defendant principally argues a denial of effective assistance of counsel due to counsel's failure to pursue a voluntary-intoxication defense. The proper standards to be applied in cases involving specific allegations of ineffective assistance of counsel were announced in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, and adopted by our Supreme Court in *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246. In *Strickland* the court held, to establish a denial of effective assistance of counsel, the defendant must satisfy a two-prong test, to wit: (1) that counsel's representation fell below an objective standard of reasonableness and (2) that his counsel's substandard representation so prejudiced the defense as to deny the defendant a fair trial. (466 U.S. 668, 80 L. Ed. 2d 677, 104 S. Ct. 2052.)

At trial, the defendant agreed with the factual basis stated by the State's Attorney that he had parked his car some distance from George Evans' house and proceeded there by foot with a .22-caliber rifle, arriving about 7 a.m. He found Evans in bed with Patricia Pence, the defendant's former girlfriend and mother of his two-year-old daughter, and shot and killed Evans with one shot to the head. The defendant then took Pence by car to his own residence. The defendant struck Pence with a rifle on the head with such force that the stock of the rifle broke off. Pence attempted to escape by running but the defendant shot her also. There were neighbors who saw the chase. Both victims died from gunshots.

The defendant was admonished at length concerning his guilty pleas. His attorney, Edward Rashid, acknowledged having seen the State's Attorney's file, which had been opened for his examination.

At the hearing on the defendant's motion to withdraw his guilty pleas, Raymond Boyles, Jr., the defendant's friend, testified that around midnight before the murders, he took the defendant home after the defendant had passed out or fallen asleep in a tavern. The last time he saw the defendant prior to the murders was about 1 a.m.

The defendant's sister, Gloria Hillenbrand, testified the defendant arrived at her parents' house around 7:45 a.m. on the morning of the

murders and she believed he was drunk. She also testified the defendant came to the house alone, rang the doorbell, entered the house quickly, and walked around. When the defendant's father telephoned the police, the defendant ran out the back door.

The defendant's father, Russell Hillenbrand, testified when the defendant arrived at his house after the murders he told his father he thought he had killed somebody. Although the defendant's father believed the defendant was drunk, he did not communicate that opinion to any of the police officers. He also testified the defendant arrived alone in a station wagon and ran into the woods from the back door when the police arrived about one-half hour later.

The defendant testified at the hearing that he remembered being at a tavern the day before the murders, but the first thing he remembered on the day of the murders was his father speaking with him. However, he also testified he had a vague idea of what had happened before he went to his father's home, and he stated that after he left his father's he went to the nearest house and called the Streator Hospital to ask about Pence's condition. He also testified that he did not know where George Evans lived. ˙

Craig Armstrong, the attorney who had represented Patricia Pence's mother in a guardianship proceeding concerning the defendant and Pence's surviving two-year-old daughter and who had also filed a dramshop action, also testified at the hearing. Armstrong stated he had talked with defendant's attorney and was given the names of the witnesses who may have seen defendant prior to the murders. Rashid also revealed to Armstrong the written statement prepared by the defendant concerning his activities on the night of the murders and the lab report of Doctor Salama concerning an analysis of the defendant's liver enzymes.

After hearing the evidence, the trial court denied defendant's motion to withdraw his guilty pleas. The cause proceeded to a sentencing hearing at which the State presented 19 witnesses in aggravation and the defense presented 22 in mitigation.

Betty Bennet, a friend of Pence's, testified about the defendant's relationship with Pence and how he would hit her, threaten her, and force himself on her. Bennet stated the defendant entered the restaurant where she and Pence worked as waitresses at around 3 a.m. on the morning of the murders and asked her about Pence's whereabouts. Bennet noticed nothing unusual about the defendant's speech other than that he was angry and she believed he was sober. Duane LaVell, another witness, also testified he saw defendant at the restaurant and stated the defendant was very angry about Pence's behavior.

John Peterson, a bouncer at the tavern where Pence and Evans had been earlier that evening, testified the defendant entered the tavern at around midnight but left shortly after entering. Peterson believed the defendant was sober and testified the defendant had no problem walking at that time.

Detective Donald Haage testified the defendant, after being captured and taken to the police station, agreed to talk but said defendant would not sign a written statement. Haage stated he noticed nothing unusual about the defendant and that he, the defendant, was definitely not intoxicated. Haage further testified neither the defendant nor any of his relatives suggested the defendant might be intoxicated.

Thomas Bunn, the jailer, testified about a conversation he and the defendant had while defendant was in his cell. The defendant related to Bunn a descriptive narration of the events before, during, and after the murders. The defendant told Bunn about arguments he and Evans had had and how, after seeing Pence's car at Evans' house that night, he drove home and picked up his rifle. Continuing his narration the defendant told Bunn he entered the house through a broken window and holding the rifle waist high shot Evans in the head. Pence then became hysterical so he hit her on the head with the rifle as hard as he could breaking the handle off the gun. Later he shot Pence as she was running away from him. The defendant also stated that although he had been drinking he was not drunk.

The defendant testified he was heavily under the influence of alcohol and therefore could not remember a lot of details of the killings. He did claim to vaguely remember striking Pence in Evans' house and seeing her on the porch where she died.

On February 24, 1984, the trial court pronounced the sentence.

■ We first observe the defendant's drinking was voluntary. Voluntary intoxication is no defense to criminal conduct unless the intoxication is so extreme as to make impossible the existence of a mental state which is an element of the crime. (*People v. Madej* (1985), 106 Ill. 2d 201, 478 N.E.2d 392.) The evidence presented was that defendant's friend, sister, and father believed him to be intoxicated. This was in strong contradiction to the testimony of the detective who interviewed the defendant after the murders. There was also testimony there was nothing unusual about the defendant's appearance, he walked straight, talked extensively about the murders, and was believed to be sober. The laboratory report on defendant's blood test was insufficient to corroborate any allegation of intoxication. From this evidence it cannot be surprising defendant's attorney did not con-

sider voluntary intoxication a viable defense.

■ We therefore find no prejudice from defendant not proceeding to trial with a defense of voluntary intoxication. The defendant pleaded guilty to avoid the death penalty. He understood the negotiations, agreed to the procedure, and the trial judge advised him of his rights pursuant to Supreme Court Rule 402 (87 Ill. 2d R. 402). We affirm the trial court's denial of the defendant's motion to withdraw his guilty plea.

■ The defendant next contends his attorney, since deceased, labored under a conflict of interest. The record reveals the defendant's attorney at trial, Edward Rashid, had previously represented Patricia Pence's parents, owners and operators of a Streator restaurant, in tax and other business matters. He also had previously represented them in their divorce and in a criminal case. Rashid had also represented the defendant and Patricia Pence in income tax and business matters and had represented the defendant in a criminal case.

The sixth amendment's guaranty of assistance of counsel necessarily requires that a criminal defendant be represented not only by counsel satisfying at least a minimum standard of professional competency, but also by counsel whose undivided loyalties lie with his client. The record before us established Rashid had concluded all representation of the Pences prior to the murders. Consequently, the numerous cases involving an ongoing relationship are inapposite. In this case the alleged conflict of interest is based on the prior representation of the victim's parents and the concern is that the lawyer's pecuniary interest in possible future business may have caused him to avoid vigorous trial representation. Looking at Rashid's pecuniary interests, testimony of his former secretary established he did not receive a large amount of income as a result of the legal representation he had provided the Pences. This State adopted a *per se* conflict-of-interest rule in *People v. Stoval* (1968), 40 Ill. 2d 109, 239 N.E.2d 441, whereby allegations and proof of prejudice are unnecessary in cases where defense counsel, without the knowledgeable assent of the defendant, might be restrained in fully representing the defendant's interest due to his or her commitments to others. (40 Ill. 2d 109, 113, 239 N.E.2d 441.) The test is not and cannot be based only upon the source of a financial gain by the attorney. A rule based solely on financial gain would not only be unworkable in the everyday practice of law but would also have no necessary correlation with the conflicts of interest that arise in such practice. (*People v. Coslet* (1977), 67 Ill. 2d 127, 364 N.E.2d 67.)

In *Stoval* the court-appointed lawyer was presently serving two

clients with different interests in the outcome of a burglary trial, whereas in the case at bar, defense counsel had concluded his representation of the Pences prior to representing the defendant in the instant case. There was no concurrent representation of two clients with conflicting interests as there was in *Stoval.*

Where the facts do not establish a *per se* conflict of interest, it is the defendant's burden to show an actual conflict of interest and to demonstrate prejudice in order to obtain a new trial. (*People v. Davis* (1983), 97 Ill. 2d 1, 452 N.E.2d 525.) There is no indication in the record Rashid did not completely represent the defendant, or that actual prejudice resulted from that representation.

The defendant further argues Rashid had an ongoing professional relationship with the Pence family, because he was the attorney for the Pences' business. However, the record indicates the Pences consulted other attorneys as well as Rashid in their legal matters and at no time did they retain Rashid for his exclusive services. There is no basis for speculating the mere possibility of some additional work for the Pences would have even slightly impaired Rashid's undivided loyalty to the defendant on trial.

In addition, the defendant contends Rashid supplied attorney Armstrong with information about the defendant's intoxication on the night of the homicides, thereby involving himself in a dramshop suit filed by Armstrong on behalf of the daughter of the defendant and the decedent Pence. This contention is without merit. Rashid had neither a professional nor a financial interest in the dramshop suit. The cases upon which the defendant relies, *People v. Richardson* (1972), 7 Ill. App. 3d 367, 287 N.E.2d 517, and *People v. Meyers* (1970), 46 Ill. 2d 149, 263 N.E.2d 81, are inapposite. In both cases, the defendant's attorney represented the party filing a dramshop action. In this case it was Armstrong, not Rashid, who was representing the plaintiff. Moreover, Armstrong's affidavit stating the defendant was to testify in his daughter's favor in the dramshop action appears to authorize any cooperation Armstrong may have received from Rashid.

Lastly, the defendant contends the trial court was in error when it imposed consecutive sentences with an aggregate minimum term exceeding 28 years. He relies on section 5—8—4(c) of the Unified Code of Corrections as originally enacted. (Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—4(c), eff. January 1, 1973, to July 1, 1974). Under the foregoing statute where consecutive sentences are imposed, neither the aggregate maximum nor the aggregate minimum of such sentences may exceed twice the maximum or lowest minimum, respectively, authorized for the most serious felony involved.

In the instant case, the trial court imposed upon defendant an aggregate minimum sentence of 130 years (*i.e.*, 80 years for the first offense of murder and 50 years for the second offense also of murder). Under the aforementioned statute, the maximum aggregate minimum sentence to be imposed would be 28 years (*i.e.*, twice 14 years, the lowest minimum for the offense of murder).

The State contends the statute was in effect only ephemerally between the time of the murders and the time the defendant was sentenced and relies on the language of the current Unified Code of Corrections to argue the consecutive sentences were properly imposed. We disagree. The defendant has cited numerous cases wherein the courts have held that where amendments to the Unified Code have become effective during the course of a defendant's prosecution, the defendant is entitled to sentencing in accordance with the act most favorable to him. *People v. Williams* (1975), 60 Ill. 2d 1, 322 N.E.2d 819; *People v. Vines* (1976), 43 Ill. App. 3d 986, 358 N.E.2d 72.

At this juncture the choice before us is to modify the sentences to run concurrently or to reduce the minimum sentences to total no more than 28 years. Such a radical reduction of the sentences imposed by the trial court would serve only to frustrate the effort to impose a punishment commensurate with the brutal and heinous conduct of the defendant. The judgment of conviction and the imposition of the sentences of 80 to 240 years' and 50 to 150 years' imprisonment are affirmed. The portion of the sentence ordering that the imprisonment be served consecutively is reversed. The cause is remanded for issuance of an amended mittimus ordering the sentences be served concurrently.

Affirmed in part, reversed in part and remanded with directions.

SCOTT, P.J., and HEIPLE, J., concur.